RANDY S. GROSSMAN
United States Attorney
PATRICK C. SWAN
Assistant U.S. Attorney
California Bar No. 306526
Office of the U.S. Attorney
880 Front St., Room 6293
San Diego, CA 92101
Telephone: (619) 546-8450
Email: Patrick.Swan@usdoj.gov

Attorneys for the United States

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 22-cr-1581-GPC-002 |
| Plaintiff, | **UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO AMEND CONDITIONS OF PRETRIAL RELEASE** |
| v. | |
| JESUS PEREZ GARCIA (2), | Date: August 25, 2022 |
| Defendant. | Time: 11:30 am |

//
//
//
//
//
//
//
//
//
//

**TABLE OF CONTENTS**

I. INTRODUCTION ………………………………………………….. 1

II. BACKGROUND ……………………………………………………. 1

    A. The Drug Seizure ……………………………………………. 1

        1. Defendant's post-arrest statement ………………………….... 2

        2. Co-defendant's post-arrest statement …………………………. 2

    B. The Pretrial Services Interview …………………………….. 3

    C. The Pretrial Release Order, Bond Package, and Information …… 4

    D. Instant Motion ……………………………………………….. 4

III. ARGUMENT ……………………………………………………… 5

    A. The Temporary Firearm Restriction is Proper and Justified, Notwithstanding Defendant's Second Amendment Rights ……….. 5

        1. Certain rights must give way to reasonable restrictions while on pretrial release to protect others' safety, lessen risk of flight, and ensure compliance with release conditions ……………….... 5

        2. The temporary firearm restriction is not an unreasonable restriction on liberty and serves the substantial interests of protecting PTS officers and ensuring Defendant's presence …... 7

    B. The Facts Presented in the Motion do not Justify Removing the Temporary Firearm Restriction …………………………………..... 8

    C. The Court can Modify Bond without Reaching the Constitutional Claim .................................................................................. 9

    D. Defendant's Second Amendment Claim Lacks Merit ………....…. 10

        1. The Second Amendment's plain text does not cover a person's right to possess a firearm while on pretrial release in order to secure a specific type of employment ……………...……….. 10

        2. The temporary firearm restriction squares with the Nation's historical tradition of gun regulation and imposing reasonable conditions of release upon defendants facing felony charges ….. 13

IV. CONCLUSION …………………………………………………... 21

UNITED STATES' OPPOSITION TO DEFENDANT'S
MOTION TO AMEND CONDITIONS OF PRETRIAL RELEASE

1

# TABLE OF AUTHORITIES

2

**CONSTITUTIONAL AMENDMENTS**

3

U.S. Const. amend. II ……………………………………………... 12

4

**CASES**

5

*Carlson v. Landon*, 342 U.S. 524 (1952) ………………………………  5, 19

6

*Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197
(2d Cir. 2004) ……………………………………………………… 11

7

*Clark v. Cmty. For Creative Non-Violence*, 468 U.S. 288 (1984) ………... 11

8

*District of Columbia v. Heller*, 554 U.S. 570 (2008) …………………… passim

9

*Ex Parte Milburn*, 34 U.S. 704 (1835) ……………………………………… 19

10

*Florence v. Board of Chosen Freeholders*, 566 U.S. 318 (2012) …………… 20

11

*Gerstein v. Pugh*, 420 U.S. 103 (1975) …………………………………… 7

12

*Hamilton v. Pallozzi*, 848 F.3d 614 (4th Cir. 2017) ………………………… 17

13

*Harmon v. City of Norman, Oklahoma*, 981 F.3d 1141 (10th Cir. 2020) …… 11

14

*Kaley v. United States*, 571 U.S. 320 (2014) ……………………………… 20

15

*Maryland v. King*, 569 U.S. 435 (2013) ……………………………………... 20

16

*McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010) ……………….. 12, 15

17

*Medina v. Whitaker*, 913 F.3d 152, 159 (D.C. Cir. 2019) …………… 14, 15, 17

18

*Nat'l Rifle Ass'n of Am., Inc. v. ATF*, 700 F.3d 185 (5th Cir. 2012),
*abrogated on other grounds by N.Y. State Rifle & Pistol Ass'n,
Inc. v. Bruen*, 143 S. Ct. 2111 (2022) …………………………..…. 14-16

19

20

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 143 S. Ct. 2111 (2022) … passim

21

*Stack v. Boyle*, 342 U.S. 1 (1951) …………………………………………… 19

22

*United States v. Arzberger*, 592 F. Supp. 2d 590 (S.D.N.Y. 2008) …………..  6

23

*United States v. Bacon*, 884 F.3d 605 (6th Cir. 2018) ………………………  6

24

*United States v. Bena*, 664 F.3d 1180 (8th Cir. 2011) ………………….. 14, 15

25

*United States v. Call*, 874 F. Supp. 2d 969 (D. Nev. 2012) …………………  6

26

*United States v. Campbell*, 309 F. Supp. 3d 738, 750 (D.S.D. 2018),
*aff'd*, No. 18-1578, 2018 WL 11392845 (8th Cir. May 4, 2018) ……  6-8

27

28

-ii-

*United States v. Charlestain*, No. 12-80054-CR, 2012 WL 1952292
(S.D. Fla. May 3, 2012) ………………………………………….   6

*United States v. Edwards*, 430 A.2d 1321, 1331 (D.C. 1981) (en banc),
*cert. denied*, 455 U.S. 1022 (1982) ………………………….  5, 19

*United States v. Kennedy*, 327 F. App'x 706 (9th Cir. 2009) (per curiam) …..   6

*United States v. Kouyoumdjian*, 601 F. Supp. 1506 (C.D. Cal. 1985) …….  5, 19

*United States v. Laurent*, 861 F. Supp. 2d 71 (E.D.N.Y. 2011) …………..  6, 16

*United States v. Love*, No. 20-20327, 2021 WL 5758940
(E.D. Mich. Dec. 3, 2021) ……………………………………..   6

*United States v. McConnell*, 842 F.2d 105 (5th Cir. 1988) …………………..  19

*United States v. Patterson*, 431 F.3d 832 (5th Cir. 2005) …………………..  15

*United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011) …………...  15

*United States v. Portes*, 786 F.3d 758 (7th Cir. 1985) …………………..  5, 19

*United States v. Rene E.*, 583 F.3d 8 (1st Cir. 2009) ……………………. 14, 15

*United States v. Salerno*, 481 U.S. 739 (1987) ……………………..  5-7, 17, 20

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc) ……………  14

*United States v. Smedley*, 611 F. Supp. 2d 971 (E.D. Mo. 2009) …………..   7

*United States v. Snead*, No. 12-132M, 2014 WL 4473773
(D.R.I. Feb. 4, 2014) ……………………………………..  5, 6, 8

*United States v. Stephens*, 594 F.3d 1033 (8th Cir. 2010) …………………..  20

*United States v. Thomas*, 540 F. Supp. 3d 363 (W.D.N.Y. 2021) …………...   8

*United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010) …………………..  14

*United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010) (per curiam) ………...  17

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) …………...  18

**STATUTES**

18 U.S.C. § 2 …………………………………………………….   4

18 U.S.C. § 922 ………………………………………………  5, 15, 16

18 U.S.C. § 3142 ………………………………………………. passim

18 U.S.C. § 3146, Pub. L. 89-465, June 22, 1966, 80 Stat. 214 …………...  19

21 U.S.C. §§ 952, 960 ……………………………………………  3, 4

-iii-

La. Sta. Ann. § 40:1379.3 ……………………………………………… 18

Tex. Gov't Code Ann. § 411.172 ……………………………………… 18

**SECONDARY SOURCES**

2 Bernard Schwarz, *The Bill of Rights: A Documentary History* 662 (1971) .. 14

Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986) …………………………………… 14

*June Carbone, Seeing through the Emperor's New Clothes: Rediscovery of Basic Principles in the Administration of Bail*, 34 Syracuse L. Rev. 517 (1983) …………………………………………………………… 19

SEN. REP. NO. 98-225, at 13 (1983) ……………………………….. 19

-iv-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.   __INTRODUCTION__

The Court should deny Defendant's motion for three principal reasons.  First, when a person is charged with a crime, certain rights must give way to reasonable restrictions in order to protect the safety of other persons and ensure compliance with release conditions. The temporary firearm condition is not an unreasonable restriction on Defendant's liberty. It serves the substantial interests in protecting the Pretrial Service Officers who will visit and supervise Defendant at his home and elsewhere, as well as assuring that he appears for trial as ordered.

Second, the facts presented in the motion do not justify removing the temporary firearm restriction.  It is still unclear exactly where Defendant wants to work, why he needs to have a gun to work there, and if employment at a business that engages in the sale and distribution of a Controlled I Substance is suitable and appropriate for a person who is on pretrial release for a felony drug charge.

Third, Defendant has not shown that the Second Amendment's plain text covers his proposed conduct: to possess a firearm in order to work as a security guard at a medical marijuana business.  Regardless, the temporary firearm restriction passes constitutional muster as it is consistent with the Nation's historical tradition of gun regulation and imposing reasonable conditions of release upon defendant facing felony charges.

# II.   __BACKGROUND__

## A.   **The Drug Seizure**

On June 24, 2022, at approximately 4:14 am, Defendant entered the United States from Mexico through the San Ysidro Port of Entry.  He was the front passenger in a car bearing California license plates.

At primary inspection, the driver of the car, co-defendant Antonio Villagomez, said the following: (1) he was driving the car to Whitter, California; (2) the car belonged to his friend, Tiffany; (3) he and his other friend, Defendant, drove Tiffany to Mexico so that she could get plastic surgery; (4) he and Defendant were going to pick up Tiffany at a later time (presumably in Mexico); and (5) he owned everything in the car.  Both Villagomez

-1-

and Defendant told the Customs Officer that they were not bringing anything into the United States from Mexico.

Upon a cursory inspection of the car, the Customs Officer found a non-factory compartment inside the car's rear bumper. The Officer referred the car to secondary.

At secondary inspection, Customs Officers found 48 packages of drugs concealed inside the car's rear bumper. Forty seven of the packages contained a white crystalline substance, field tested positive for methamphetamine, and weighed approximately 11.24 kilograms (24.78 pounds). The 48th package contained blue pills, field tested positive for fentanyl, and weighed approximately 453.50 grams (one pound). Officers subsequently placed Defendants under arrest.

### 1.    Defendant's post-arrest interview

Post-arrest, Defendant knowingly and voluntarily waived his *Miranda* rights and gave a statement to law enforcement. He denied knowledge of the drugs inside the car. He said that his friend Tiffany picked up him and co-defendant Villagomez in Whitter, California and traveled with them to Tijuana, Mexico. He said that he and Villagomez went to Tijuana to "chill and go fishing," and they dropped off Tiffany at a clinic so she could have surgery. He said that Tiffany did not go back with them to the United States because she was recovering from surgery at a relative's house. Further, Defendant said that he and Villagomez stayed at a hotel in Mexico; that he paid for the hotel room; and that the car was parked at the hotel until Villagomez drove it away to get tacos.

During the post-*Miranda* interview, Defendant admitted that he was told before crossing the border that Villagomez was going to get drugs in Mexico. He clarified, however, that he thought the drugs were going to be a smaller, personal use amount. Defendant denied being paid to cross drugs into the United States.

### 2.    Co-defendant's post-arrest interview

Post-arrest, co-defendant Villagomez also knowingly and voluntarily waived his *Miranda* rights and gave a statement to law enforcement. He admitted to knowledge of the drugs inside the car. He said that he and his friend, Defendant, drove from the United

States to Tijuana, Mexico to go fishing.  He said that his other friend, Tiffany, was already in Mexico when they crossed the border.  He said that they did not get a hotel in Mexico.  Rather, he parked the car on a street in Tijuana and he and Defendant walked to go get tacos together.  He said that the people responsible for the drugs knew where he and the car would be located while he was in Mexico.

During the post-*Miranda* interview, Villagomez admitted that he was going to be paid $4,000 to cross the drug-laden car into the United States.  He claimed that Defendant did not know that drugs were inside the car.  Yet, he said that he was going to pay $2,000 to Defendant after they crossed the drug-laden car.  He said that he was going to be given a location to drop off the car in the United States after crossing the border.

**B.    The Pretrial Services Interview**

On June 27, 2022, Defendant and Villagomez were charged with two counts of importation of a controlled substance, in violation of 21 U.S.C. §§ 952, 960.  ECF No. 1.

Before the initial appearance later that day, Pretrial Services ("PTS") interviewed Defendant to prepare a bail report for the Court's consideration.  During the interview, Defendant said that he had been unemployed for seven months.  He reported that he does construction work with his friend when they have jobs to do.  He said that he previously worked at a landscaping company for six months and several warehouses for two years.  He said that he had done construction work for about two months.  Defendant's mother verified this information, stating that Defendant does construction work "here and there."

Based on the PTS report, at no point during the PTS interview did Defendant say that he previously worked as a security guard,[1] let alone for "the greater part of this past year … at a legal medical marijuana shop."  Mot. Amend Conditions, 2:6-7, ECF No. 29.

Additionally, during the PTS interview, Defendant reported that he occasionally uses cocaine and last used it five weeks before the offense.  He also reported that he uses marijuana twice a week and last used it five days before the offense.  He further reported

---

[1]    During the post-arrest biographical interview, Defendant stated that he is an unemployed security guard.

that he owns a "pistol" and that it is located at his home in the Los Angeles County area. He said that he lives at home with his mother, father, and two sisters.

### C.    The Pretrial Release Order, Bond Package, and Information

At the initial appearance, the Court held a bond hearing and found that it could set conditions of release that will reasonably assure Defendant's appearance as required and the safety of any other person and the community. *See* ECF No. 5. The Court imposed each of the mandatory and standard conditions in its pretrial release order, including the standard requirement that the defendant not possess a firearm while on pretrial release. Pretrial Release Order, 1(4), ECF No. 10. The Court set additional pretrial conditions, such as a requirement to seek full-time employment, participate in drug testing, and execute an appearance bond in the amount of $10,000 secured by Defendant's signature and the signature of one financially responsible adult. *Id.* at 1(10(b)), 1-2(12(a)-(c), (f)).

Several days later, Defendant submitted an appearance bond package to the United States for approval. On the Bail Information Sheet, it stated that the name of Defendant's employer was "security @ Medical shop" and the length of employment was "4 months." Appearance Bond, 4, ECF No. 15. Defendant did not provide additional information or documents in the appearance bond package to support the claimed employment.

On June 30, 2022, the Court approved the executed appearance bond package and released Defendant from custody subject to its pretrial release order. ECF Nos. 13, 15. Defendant was in custody for approximately three days. He is currently on bond.

Three weeks later, Defendant waived indictment in open court and pled not guilty to a two count Information charging him with importation of methamphetamine and fentanyl, in violation of 21 U.S.C. §§ 952, 960 and 18 U.S.C. § 2. ECF Nos. 21, 22. Defendant is currently facing the two charges in the Information.

### D.    Instant Motion

On July 29, 2022, Defendant filed a motion to remove standard condition #4 from his pretrial release conditions. ECF No. 29. In the motion, Defendant argues that he has a constitutional right to possess a gun while on pretrial release for employment purposes,

1   and standard condition #4 infringes upon that right.  He claims that he "must" carry a

2   firearm to be employed as a security guard at a medical marijuana business, and "he

3   wishes to have his firearm returned so that he can remain gainfully employed in the

4   security industry while on pretrial release." *Id.* at 9:12-15.  This opposition follows.

## III.   ARGUMENT

### A.   The Temporary Firearm Restriction is Proper and Justified, Notwithstanding Defendant's Second Amendment Rights

#### 1.   Certain rights must give way to reasonable restrictions while on pretrial release to protect others' safety, lessen risk of flight, and ensure compliance with release conditions

10        There is no absolute right to pretrial release under the Fifth or Eighth Amendment.

11   *United States v. Portes*, 786 F.3d 758, 766 (7th Cir. 1985); *see United States v. Edwards*,

12   430 A.2d 1321, 1331 (D.C. 1981) (en banc), *cert. denied*, 455 U.S. 1022 (1982) (pretrial

13   release is not a constitutional right); *United States v. Kouyoumdjian*, 601 F. Supp. 1506,

14   1551 (C.D. Cal. 1985) (citing *Edwards*); *Carlson v. Landon*, 342 U.S. 524, 525 (1952)

15   (Congress can deny pretrial release in capital cases).  Rather, federal courts have the

16   power to deny pretrial release under particular circumstances.  *See* 18 U.S.C. § 3142(e);

17   *see also United States v. Salerno*, 481 U.S. 739, 749 (1987) (recognizing that a defendant

18   may be detained until trial if he presents a risk of flight or danger to witnesses); *id.* at 755

19   (holding that the provision of the 1984 Bail Reform Act allowing pretrial detention due to

20   a defendant's potential dangerousness is constitutional).

21        Likewise, there is no absolute right for a defendant to possess a firearm while on

22   pretrial release under the Second Amendment.  *United States v. Snead*, No. 12-132M,

23   2014 WL 4473773, at *8 (D.R.I. Feb. 4, 2014).  Neither *District of Columbia v. Heller*,

24   554 U.S. 570 (2008) nor *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 143 S. Ct. 2111

25   (2022) concludes that such a right exists while a felony charge is pending.  Logically, if

26   the government has the power to detain a defendant pending trial and deny him the right

27   to possess a firearm altogether, it must also have the lesser power to release him subject to

28   appropriate conditions, such as a firearm restriction.

1    Congress has enacted laws that limit a defendant's ability to deal with firearms

2    while a felony indictment is pending. For example, 18 U.S.C. § 922(d)(1) prohibits sales

3    of firearms to a defendant under felony indictment. Further, 18 U.S.C. § 922(n) prohibits

4    a defendant under felony indictment from shipping, transporting, or receiving firearms

5    transported in interstate commerce. Federal courts have upheld both of these statutes

6    following *Heller*. *See, e.g., United States v. Charlestain*, No. 12-80054-CR, 2012 WL

7    1952292, at \*4-5 (S.D. Fla. May 3, 2012) (§ 922(d)(1) is not unconstitutionally vague);

8    *United States v. Bacon*, 884 F.3d 605, 611 (6th Cir. 2018) (§ 922(d)(1) does not violate

9    the Commerce Clause or the Second Amendment); *United States v. Laurent*, 861 F. Supp.

10   2d 71, 97-105 (E.D.N.Y. 2011) (§ 922(n) is facially constitutional); *United States v. Call*,

11   874 F. Supp. 2d 969, 979 (D. Nev. 2012) (same); *United States v. Love*, No. 20-20327,

12   2021 WL 5758940, at \*5-6 (E.D. Mich. Dec. 3, 2021) (same).

13   The same is true for the pretrial firearm restriction in Section 3142(c)(1)(B)(viii).

14   Federal courts have upheld this provision after the Supreme Court's decision in *Heller*.

15   *See, e.g., Snead*, 2014 WL 4473773, at \*8; *United States v. Campbell*, 309 F. Supp. 3d

16   738, 750 (D.S.D. 2018), *aff'd,* No. 18-1578, 2018 WL 11392845 (8th Cir. May 4, 2018).

17   The Ninth Circuit has also said that the pretrial firearm restriction is an absolute condition

18   of the Adam Walsh Act. *United States v. Kennedy*, 327 F. App'x 706, 707 (9th Cir. 2009)

19   (per curiam) (unpublished mem.) (the firearm restriction in Section 3142(c)(1)(B)(viii) is

20   absolute by its own terms); *contra United States v. Arzberger*, 592 F. Supp. 2d 590, 603

21   (S.D.N.Y. 2008) (imposition of the firearm restriction in Section 3142(c)(1)(B)(viii) runs

22   afoul of due process if defendant is not provided the opportunity to contest whether such a

23   condition is reasonably necessary in his case to secure the community's safety).

24   In *United States v. Salerno*, 481 U.S. 739 (1987), the Supreme Court upheld the

25   constitutionality of the provision in the 1984 Bail Reform Act allowing pretrial detention

26   based on potential dangerousness. *Id.* 755. The Court reversed the lower court's decision

27   that substantive due process prohibits deprivation of a person's liberty merely because that

28   person was thought to present a danger to the community. *Id.* at 745.

-6-

1    In arriving at its holding, the *Salerno* Court said that it has "repeatedly held that the

2    Government's regulatory interest in community safety can, in appropriate circumstances,

3    outweigh an individual's liberty interest." *Id.* at 748.  For example, the Court explained

4    that if the police suspect a person of a crime, they may arrest and hold him until a neutral

5    Magistrate Judge determines if probable cause exists.  *Id.* at 749 (citing *Gerstein v. Pugh*,

6    420 U.S. 103 (1975)).  People have a "strong interest in liberty," but this interest "may, in

7    circumstances where the government's interest is sufficiently weighty, be subordinated to

8    the greater needs of society." *Id.* at 751.

### 2.    The temporary firearm restriction is not an unreasonable restriction on liberty and serves the substantial interests of protecting PTS officers and ensuring Defendant's presence

11    At least one federal court has concluded that the imposition of a pretrial restriction

12    on the possession of firearms to be critical "in most cases" because it safeguards the PTS

13    Officers who visit a defendant's residence or otherwise have contact with the defendant in

14    the course of supervision.  *United States v. Smedley*, 611 F. Supp. 2d 971, 974 (E.D. Mo.

15    2009).  It is also a standard pretrial release condition in this district.  *See* Pretrial Release

16    Order, 1(4), ECF No. 10.  It should not be disputed that, if PTS is to supervise Defendant

17    at all, it is a reasonable safety measure for the supervising PTS Officer to know that all

18    firearms have been removed from Defendant's residence prior to a visit.  *See Sneed*, 2014

19    WL 4473773, at *8 (concluding the same).

20    Further, at least one federal court has found that the imposition of a pretrial

21    restriction on the possession of firearms can serve the interest of assuring a defendant's

22    presence at trial.  *See Campbell*, 309 F. Supp. 3d at 750.  In *Campbell*, the district court

23    stated that, in more than one case assigned to the court, a defendant facing significant

24    mandatory minimum penalties has taken his own life before trial.  *Id.*

25    Here, the type and quantity of the narcotics seized subject Defendant to a potential

26    10 year mandatory minimum penalty.  The potential length of imprisonment is significant

27    even if he is afforded safety valve.  And given his reported use of cocaine and marijuana

28    in the weeks before the offense, this is an interest that should be considered.

-7-

1   While Defendant appears to believe that his liberty interest in possessing a firearm
2   is paramount and overcomes any incongruous pretrial release condition set by this Court,
3   "the reality is that once an individual has been charged with a crime, certain rights must
4   give way to reasonable restrictions in order to protect the safety of others and the
5   community, prevent any risk of flight, and ensure compliance with pretrial release
6   conditions." *United States v. Thomas*, 540 F. Supp. 3d 363, 370 (W.D.N.Y. 2021).
7   *Thomas* specifically identified a federal court's ability to impose a pretrial firearm
8   restriction under Section 3142(c)(1)(B)(viii), "notwithstanding an individual's Second
9   Amendment rights." *Id.*  Again, if the government has the power to detain a defendant
10  pending trial and deny him the right to possess a firearm altogether, it must also have the
11  lesser power to release him subject to reasonable conditions, such as a firearm restriction.

12  Here, following a bail hearing, the Court determined that the temporary firearm
13  restriction was reasonably necessary to assure Defendant's appearance as required and the
14  safety of any other person and the community.  Defendant had an opportunity to be heard
15  and the Court afforded him due process.  As set forth above, the Court can set release
16  conditions that place reasonable restrictions on Defendant's liberty in order to secure
17  Defendant's presence at trial, to protect PTS officers who will supervised Defendant
18  during the pendency of the case, and to ensure his compliance with release conditions.
19  The temporary firearm restriction is proper and justified in this case, "notwithstanding
20  [Defendant's] Second Amendment rights." *Thomas*, 540 F. Supp. 3d at 370.

21  The Court should follow the reasoning of *Snead*, *Campbell*, and *Thomas* and
22  conclude that the right to carry a firearm on pretrial release is limited by the Court's
23  determination of reasonable conditions of release in lieu of custody and the statutory
24  interests embodied in Section 3142(c)(1)(B).

**B.     The Facts Presented in the Motion do not Justify Removing the Temporary Firearm Restriction**

27  From a factual perspective, Defendant has not shown a reasonable relationship
28  between his temporary inability to possess a firearm and his ability to seek and obtain

-8-

full-time employment while on pretrial release.  For example, other than the brief facts presented in the instant motion, *see* Mot. Amend Conditions of Pretrial Release, 2:6-9, ECF No. 29, Defendant has not shown that: (1) he is unable to get a job that does not require him to carry a firearm; (2) he is unable to work as a security guard at a business that does not require him to carry a firearm; or (3) either PTS or the Court has approved his request to work at a business that engages in the sale and distribution of a Controlled I Substance.  The requested employment may arguably violate the first mandatory condition of the pretrial release order; specifically, that Defendant not violate any federal laws during his period of release.  *See* Pretrial Release Order, 1(1), ECF No. 10.

Additionally, Defendant has not disclosed any information about the name of the medical marijuana business, where the business is located, who owns and operates the business, whether the business is properly licensed and qualified to sell and distribute marijuana under state law, and if he was employed by the business at the time of the offense and lost his job by virtue of the imposition of the temporary firearm restriction. Again, Defendant said in both the PTS interview and post-arrest biographical interview that he was unemployed at the time of the offense.

Without further information, it is difficult to know if the requested employment is appropriate and suitable for Defendant while on pretrial release.  It is also difficult to know if PTS can safely monitor and supervise Defendant while he is employed at the medical marijuana business, particularly given the likelihood that the business carries significant quantities of cash at its physical location and could be considered a target of robberies, including those involving firearms.  Lastly, it is difficult to know if Defendant actually needs to possess a firearm in order to seek and obtain full-time employment while on pretrial release.

Because Defendant has not provided sufficient information for either the Court or PTS to make a determination on these issues, the Court should deny the motion and require Defendant to submit additional information.

//

-9-

### C.      The Court can Modify Bond without Reaching the Constitutional Claim

If the Court is inclined to allow Defendant to possess a firearm at certain reasonable times and places while on pretrial release, it can modify his conditions of release without reaching the constitutional issue.  For example, the Court can modify conditions to allow Defendant to possess a pistol at home for self-defense purposes, and require him to store and lock the firearm in a secure area when PTS Officers do a home visit.  The Court could alternatively allow him to possess a pistol for work purposes only, and require him to store and lock the firearm in a secure area at his place of employment during non-work hours.  The Court could also set a combination of conditions and impose other conditions to assure his compliance with bond.  Either way, his request to modify the conditions of release is not necessarily dependent on or subject to a finding that the temporary firearm restriction in standard condition #4 is unconstitutional.

### D.      Defendant's Second Amendment Claim Lacks Merit

#### 1.      The Second Amendment's plain text does not cover a person's right to possess a firearm while on pretrial release in order to secure a specific type of employment

Even if the Court ultimately reviews the constitutionality of standard condition #4 under the Supreme Court's decision in *Bruen*, Defendant cannot meet his initial burden to show that the Second Amendment's plain text protects his proposed conduct: to possess a firearm in order to work as a security guard at a medical marijuana business.

In *Bruen*, the Supreme Court clarified *Heller's* "text-and-history standard" in reviewing a Second Amendment challenge to a firearm regulation.  142 S. Ct. at 2138. The Court held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."  *Id.* at 2126.  Once this initial showing is met, the burden shifts to the government to affirmatively demonstrate that the firearm regulation is "consistent with this Nation's historical tradition of firearm regulation."  *Id.*  If the government fails to meet this burden, the law is unconstitutional under the Second Amendment.  *Id.*

//

-10-

1    *Bruen* did not specifically address which party has the burden of showing that the

2    Second Amendment's text covers – and "presumptively" protects – the conduct at issue.

3    *See* 142 S. Ct. at 2130.  But it implied that the party challenging a gun regulation has that

4    initial burden.

5    Again, *Bruen's* analysis proceeded in two steps: it asked whether the Second

6    Amendment's plain text covers the conduct at issue; and second, whether the regulation

7    squares with the Nation's history of gun regulation.  *See, e.g.*, 142 S. Ct. at 2126, 2130.

8    At step two, the Court assigned the government the burden of offering historical evidence

9    to support the regulation.  To do so, the Court analogized to "the freedom of speech in the

10   First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms."

11   *Id.* at 2130 (citing *Heller*, 554 U.S. at 582, 595, 606, 618, 634-635).  The Court did not

12   explicitly say which party has the burden at step one.  Nor did it need to as the parties

13   agreed that the respondents were among "the people" whom the Second Amendment

14   protects and that publicly carrying handguns for self-protection fell within "the right to

15   keep and bear arms."  *Id.* at 2134.

16   Continuing the Supreme Court's analogy to the First Amendment's burden-shifting

17   framework, the party challenging a gun regulation has the burden at step one.  Though the

18   government has the burden of justifying an alleged restriction on the freedom of speech,

19   the party challenging the restriction must show that the First Amendment right applies in

20   the first place.  *See, e.g., Harmon v. City of Norman, Oklahoma*, 981 F.3d 1141, 1147

21   (10th Cir. 2020) ("Plaintiffs had the initial burden of showing that the First Amendment

22   applies to their conduct.") (citing *Clark v. Cmty. For Creative Non-Violence*, 468 U.S.

23   288, 294 n.5 (1984) ("Although it is common to place the burden upon the Government to

24   justify impingements on First Amendment interests, it is the obligation of the person

25   desiring to engage in assertedly expressive conduct to demonstrate that the First

26   Amendment even applies.  To hold otherwise would be to create a rule that all conduct is

27   presumptively expressive."); *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356

28   F.3d 197, 205 (2d Cir. 2004) ("The party asserting that its conduct is expressive bears the

burden of demonstrating that the First Amendment applies."). Likewise, here, Defendant has the burden of showing that the Second Amendment applies to – and presumptively protects – his proposed course of conduct.

The Second Amendment provides that: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. It confers an individual right to keep and bear arms specifically for the purpose of self-defense. *Heller*, 544 U.S. at 628 ("[T]he inherent right of self-defense has been central to the Second Amendment right."); *id.* at 630 (describing self-defense as the "core" purpose of the Second Amendment); *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 765 (2010) ("[I]n *Heller*, we held that individual self-defense is 'the *central component [ ]*' of the Second Amendment right.") (emphasis in original); *Bruen*, 142 S. Ct. at 2118 ("[I]ndividual self-defense is 'the central component' of the Second Amendment right") (emphasis in original).

Only those laws and regulations that infringe upon the right to keep and bear arms for the purpose of self-defense run afoul of the Second Amendment. *See Heller*, 544 U.S. at 635 (law-abiding citizens have a Second Amendment right to possess a firearm at home for self-defense purposes); *Bruen*, 142 S. Ct. at 2122 (extending *Heller* to public places). Both *Heller* and *Bruen* explained that the Second Amendment is not a right to keep and carry a firearm for *any* type of confrontation. *See Heller*, 544 U.S. at 595 ("The right [to bear arms] was not unlimited, just as the First Amendment's right of free speech was not … [W]e do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose*.") (emphasis in original); *id.* at 626 ("[T]he right [to bear arms] was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."); *Bruen*, 142 S. Ct. at 2128 ("From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right [to bear arms] was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.").

-12-

Here, Defendant's proposed course of conduct – possessing a firearm in order to secure work as a security guard at a medical marijuana shop – does not fall within the plain text of the Second Amendment.  The proposed conduct is not for a self-defense purpose.  Instead, it is for an employment purpose.  Nothing in the Second Amendment's plain text specifically protects a person's right to possess a firearm to secure a certain type of employment.  Nothing in *Heller* or *Bruen* suggests that a person has a right to possess a firearm in order to secure employment, let alone a specific type of employment.  Even if Defendant planned to use his pistol for the purpose of protection at the medical marijuana business, by virtue of his employment that purpose would be to protect the business and the safety of *other* people and things at the business, such as the employees, customers, and property.  It would not specifically or primarily be for a self-defense purpose.

Because Defendant has not shown that his proposed course of conduct falls within the Second Amendment's plain text, he has not met his initial burden to show that the Constitution presumptively protects his right to possess a firearm in order to secure employment.  Without that showing, Defendant's constitutional claim fails.

>    **2.    The temporary firearm restriction squares with the Nation's historical tradition of gun regulation and imposing reasonable conditions of release upon defendants facing felony charges**

Even if Defendant meets his initial burden to demonstrate that his proposed course of conduct falls within the Second Amendment's plain text, the United States can show that the temporary firearm restriction squares with the Nation's historical tradition of gun regulation and imposing reasonable conditions of release upon defendants facing felony charges.

First, the Nation's historical tradition embraces restricting the gun rights of certain groups viewed by legislatures as unvirtuous or dangerous.

The Second Amendment sets forth a "right of *law-abiding*, *responsible* citizens." *Bruen*, 142 S. Ct. at 2131 (italics added) (quoting *Heller*, 554 U.S. at 635).  Particular gun rights of certain groups have been restricted to promote public safety.  "The historical record shows that gun safety regulation was commonplace in the colonies, and around the

time of the founding, a variety of gun safety regulations were on the books." *Nat'l Rifle Ass'n of Am., Inc. v. ATF*, 700 F.3d 185, 194 (5th Cir. 2012), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111 (2022).  The regulations  "included safety laws … disarming certain groups and restricting sales to certain groups." *Id.*  "For example, several jurisdictions passed laws that confiscated weapons owned by persons who refused to swear an oath of allegiance to the state or to the nation." *Id.*; *see also Medina v. Whitaker*, 913 F.3d 152, 159 (D.C. Cir. 2019) (explaining that "during the revolution, the states of Massachusetts and Pennsylvania confiscated weapons belonging to those who would not swear loyalty to the United States").

Historical accounts confirm the founders' attitudes towards disarming potentially dangerous citizens.  "*Heller* identified … as a 'highly influential' 'precursor' to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (quoting 554 U.S. at 604).  That report recognized that the government could disarm potentially dangerous or irresponsible people, stating that "citizens have a personal right to bear arms 'unless of *crimes committed, or real danger of public injury*.'" *Id.* (italics added) (quoting 2 Bernard Schwarz, *The Bill of Rights: A Documentary History* 662, 665 (1971)).

"[M]ost scholars of the Second Amendment agree that the right to bear arms was 'inextricably … tied to' the concept of a 'virtuous citizen[ry]'" and that the right to bear arms "does not preclude laws disarming the unvirtuous citizens (i.e. criminals)." *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) (collecting scholarly sources). The Second Amendment therefore incorporates "a common-law tradition that permits restrictions directed at citizens who are not law-abiding and responsible." *United States v. Bena*, 664 F.3d 1180, 1183-84 (8th Cir. 2011) (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986); *see also United States v. Rene E.*, 583 F.3d 8, 15-16 (1st Cir. 2009).

//

-14-

The Supreme Court has recognized the historical tradition of disarming unvirtuous or dangerous citizens.  In *Heller*, it endorsed "longstanding prohibitions on the possession of firearms by felons and the mentally ill," among others.  544 U.S. at 626-27.  The Court "identif[ied] these presumptively lawful regulatory measures only as examples; [its] list d[id] not purport to be exhaustive."  *Id.* at 627 n.26.  In *McDonald*, the Court reiterated that *Heller* "did not cast doubt on" those "longstanding regulatory measures."  *McDonald*, 561 U.S. at 786.  Nothing in *Bruen* casts doubt on those longstanding regulations either. *See Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) (explaining that the Court's decision "does not expand the categories of people who may lawfully possess a gun"); *id.* at 2162 (Kavanaugh, J., concurring) (reiterating *Heller's* statements).

Courts relying on this "'virtuous citizen' theory" have upheld "modern laws banning the possession of firearms by illegal aliens and juveniles – classes of people who otherwise show, on a case-by-case basis, that they are not particularly dangerous." *Medina*, 913 F.3d at 159.  In *National Rifle*, the Fifth Circuit rejected a Second Amendment challenge to Section 922(b)(1) and (c)(1), which restrict the ability of people under 21 to buy handguns, calling that restriction "firmly historically rooted."  700 F.3d at 204.  The court explained that the regulation "is consistent with a longstanding tradition of targeting select groups' ability to access and to use arms for the sake of public safety."  *Id.* at 203; *see also Rene E.*, 583 F.3d at 16 (rejecting a Second Amendment challenge to Section 922(x), which restricts the ability of people under 18 to possess handguns).

Courts have also reasoned for other categorical restrictions similar to, but not included in, *Heller's* nonexhaustive list of presumptively lawful regulations.  *See, e.g., United States v. Portillo-Munoz*, 643 F.3d 437, 439-40 (5th Cir. 2011) (holding that Section 922(g)(5)'s prohibition of gun possession by illegal aliens does not violate the Second Amendment); *Bena*, 664 F.3d at 1184 (holding that Section 922(g)(8)'s restriction of gun possession by people under domestic-violence protective orders "is consistent with a common-law tradition that that the right to bear arms is limited to peaceable or virtuous citizens"); *United States v. Patterson*, 431 F.3d 832, 836 (5th Cir. 2005) ("Prohibiting

-15-

1  drug users from possessing firearms is not inconsistent with the right to bear arms

2  guaranteed by the Second Amendment.").

3      The temporary gun restriction in Section 3142(c)(1)(B)(viii) is analogous to

4  historical gun regulations to pass constitutional muster.  Contrary to Defendant's

5  argument, the constitutional question is not whether this restriction has existed since the

6  Nation's founding.  Rather, courts considering present-day firearm regulations must

7  "reason[ ] by analogy." *Bruen*, 142 S. Ct. at 2132.  "[A]nalogical reasoning requires only

8  that the government identify a well-established and representative historical *analogue*, not

9  a historical *twin*." *Id.* (emphasis in original); *see Nat'l Rifle*, 700 F.3d at 196 ("*Heller*

10  demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a

11  precise founding-era analogue").  "[E]ven if a modern-day regulation is not a dead ringer

12  for historical precursors, it still may be analogous enough to pass constitutional muster."

13  *Bruen*, 142 S. Ct. at 2133.

14      Similar to the age-based regulation addressed in *National Rifle*, Section

15  3142(c)(1)(B)(viii) "is consistent with a longstanding tradition of targeting select groups'

16  ability to access … arms for the sake of public safety."  And similar to Section 922(n),

17  which restricts individuals under felony indictment from shipping, transporting, or

18  receiving firearms transported in interstate commerce, Section 3142(c)(1)(B)(viii)

19  "reflects a concern with keeping firearms out of the hands of categories of potentially

20  irresponsible persons." *Laurent*, 861 F. Supp. 2d at 82.  The regulation thus reflects a

21  permissible legislative judgment that persons on pretrial release facing felony charges are

22  among the potentially unvirtuous citizens whose gun rights the government may restrict.

23      Although a person on pretrial release who is facing felony charges is presumed

24  innocent until proven guilty, a legislature's decision to restrict the person's gun access,

25  subject to a neutral Magistrate Judge's determination that a temporary firearm restriction

26  will reasonably assure the person's appearance as required and safety of the community,

27  squares with historical public safety laws.  Moreover, Defendant waived his right to a

28  grand jury and implicitly acknowledged that probable cause exists to believe he has

1    committed a felony, "the most serious category of crime deemed by the legislature to

2    reflect 'grave misjudgment and maladjustment.'"  *Medina*, 913 F.3d at 158 (quoting

3    *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017)).

4        Additionally, at the Nation's founding, a person facing felony charges frequently

5    foretold more severe consequences than the loss of gun rights.  The standard punishment

6    for a felony was death.  *Medina*, 913 F.3d at 158 ("Capital punishment for felonies was

7    ubiquitous in the late Eighteenth Century and was the standard penalty for all serious

8    crimes." (cleaned up)).  It is "difficult to conclude" that the founding generation would

9    have understood those standing accused of capital crimes, and facing death if convicted,

10   to enjoy unfettered gun rights.  *See id.*  Rather, those facing felony charges were among

11   the "unvirtuous citizens," *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010)

12   (per curiam), whom legislatures could lawfully disarm.

13       Second, the Nation's historical tradition embraces the longstanding practice of

14   restricting liberty interests – including gun rights – of those charged with serious crimes.

15   The government has always been able to impose "substantial liberty restrictions" on those

16   charged with a felony offense (including detention or, alternatively, conditions of pretrial

17   release) when needed to promote "the operation of our criminal justice system."  *Salerno*,

18   481 U.S. at 749.  This plainly squares with Section 3142(c)(1)(B)(viii), which allows

19   federal courts to order a person on pretrial release to "refrain from possessing a firearm,

20   destructive device, or other dangerous weapon" if needed to "reasonably assure the

21   appearance of the person as required and the safety of any other person and the

22   community."

23       States also commonly restrict the gun rights of those charged with serious crimes,

24   and the Supreme Court implicitly endorsed those restrictions in *Bruen*.  Though the Court

25   invalidated New York's licensing regime giving official discretion to deny licenses absent

26   a showing of special need, it noted that "nothing in [its] analysis should be interpreted to

27   suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes."  *Bruen*,

28   142 S. Ct. at 2138 n.9; *see also id.* at 2161 (Kavanaugh, J., concurring) ("[T]he Court's

-17-

1   decision does not affect the existing licensing regimes – known as 'shall-issue' regimes –
2   that are employed in 43 states.").  The Court described those shall-issue regimes as setting
3   "narrow, objective, and definite standards" to ensure "that those bearing arms in the
4   jurisdiction are, in fact, law-abiding, responsible citizens."  *Id.* at 2138 n.9 (quotation
5   marks omitted).

6        Those shall-issue regimes are more restrictive than 3142(c)(1)(B)(viii).  Among
7   their eligibility criteria for obtaining a license, they commonly disqualify those under
8   felony indictment or information.  *See, e.g.*, Tex. Gov't Code Ann. § 411.172(a)(4)
9   (requiring that the applicant "is not charged with the commission … of a felony under an
10  information or indictment"); La. Sta. Ann. § 40:1379.3(C)(10) (requiring that the
11  applicant "not be charged under indictment or a bill of information for any crime of
12  violence or any crime punishable by imprisonment for a term of one year or greater").
13  Those schemes thus defeat – for anyone under a felony information – what *Bruen* called
14  the core Second Amendment right to bear arms in public for self-defense.  *See* 142 S. Ct.
15  at 2134-35.  If the Court views those regimes as consistent with the Nation's tradition of
16  gun regulation, then it should conclude the same for 3142(c)(1)(B)(viii), which does not
17  burden the right of public carry but just bars people on pretrial release from temporarily
18  possessing a firearm if a neutral Magistrate Judge finds that the condition is reasonably
19  necessary to assure that person's appearance as required and the safety of any other person
20  and the community.

21       Another historical example supports temporarily restricting the gun rights of those
22  accused but not convicted of wrongdoing.  *Bruen* described mid-19th century "surety
23  statutes," which restricted citizens' gun access based on accusations alone.  *See* 142 S. Ct.
24  at 2148-49.  The surety statutes required people to post a money bond before carrying a
25  gun once they were "reasonably accused of intending to injure another or breach the
26  peace."  *Id.*; *see also Wrenn v. District of Columbia*, 864 F.3d 650, 661 (D.C. Cir. 2017)
27  (explaining that English surety laws required a person "reasonably accused of posing a
28  threat" to "post a bond to be used to cover any damage he might do" by carrying a gun).

1   And if the person could not post the required bond, his liberty to possess a firearm was

2   restricted regardless of his Second Amendment rights.

3   Lastly, third, the Nation's historical tradition embraces a court's ability to detain a

4   defendant pending trial or to release him subject to reasonable limitations on his liberty.

5   Trial courts have long had the authority to impose conditions on defendants' ability

6   to remain at liberty pending trial, or even to detain them.  The institution of bail, which is

7   expressly recognized by the Eighth Amendment, has existed for centuries.  *See, e.g., June*

8   *Carbone, Seeing through the Emperor's New Clothes: Rediscovery of Basic Principles in*

9   *the Administration of Bail*, 34 Syracuse L. Rev. 517-529 & n.1 (1983) (explaining that the

10  institution of bail existed in English law since shortly after the Norman conquest, defining

11  "bail" broadly to refer to any condition of pretrial release).  As previously detailed, there

12  is no constitutional right to bail.  *Portes*, 786 F.3d at 766; *Edwards*, 430 A.2d at 1331;

13  *Kouyoumdjian*, 601 F. Supp. at 1551; *Carlson*, 342 U.S. at 525 (1952).  Rather, pretrial

14  release has been conditioned on a defendant's giving assurance "that he will stand trial

15  and submit to sentence if found guilty."  *Stack v. Boyle*, 342 U.S. 1, 4-5 (1951) (citing *Ex*

16  *Parte Milburn*, 34 U.S. 704, 710 (1835).  A defendant may even be detained pending trial

17  where he cannot pay the bail required.  *United States v. McConnell*, 842 F.2d 105, 107-08

18  (5th Cir. 1988).  Congress has sought to reduce pretrial detention resulting solely from an

19  indigent defendant's inability to pay by instructing courts to prioritize nonfinancial

20  conditions of release, including restrictions on travel and association, curfews, and "any

21  other condition deemed reasonably necessary."  Bail Reform Act of 1966, 18 U.S.C. §

22  3146, Pub. L. 89-465, June 22, 1966, 80 Stat. 214.  Those "other conditions" included

23  restrictions on firearms possession while on bond.  *See, e.g.*, SEN. REP. NO. 98-225, at

24  13 (1983) ("Although each of the additional conditions could appropriately be imposed

25  today under the catch-all in current law, spelling them out in detail is intended to

26  encourage the courts to utilize them in appropriate circumstances.").  All of the

27  nonfinancial conditions of release are less restrictive than pretrial detention.

28  //

-19-

Under Section 3142, a federal court can order a defendant detained pending trial, *Salerno*, 481 U.S. at 741, where he would necessarily be precluded from possessing any type of firearm while in custody. This is consistent with historical tradition of the United States' founding, as there is no constitutional right to bail. Again, based on historical tradition, if the government has the greater power to put a defendant in custody pending trial and deny him the right to possess a firearm altogether, it must also have the lesser power to release him subject to reasonable conditions.

Further, throughout history, the government has had the power to restrict other liberties and constitutional rights in the pretrial context. For example, by subjecting a defendant to searches that would otherwise be unreasonable, *see Maryland v. King*, 569 U.S. 435 (2013) (DNA collection); *Florence v. Board of Chosen Freeholders*, 566 U.S. 318 (2012) (strip searches), by imposing curfews or electronic monitoring, *see United States v. Stephens*, 594 F.3d 1033, 1039 (8th Cir. 2010), or by freezing assets that one wants to use to pay his chosen lawyer, *see Kaley v. United States*, 571 U.S. 320 (2014). If a historical tradition of restricting other pretrial rights exists, the power to release a defendant subject to a temporary firearm restriction has similar authority.

The historical tradition of the Eighth Amendment, as well as the historical traditions in both judge-made and statutory law, contemplate in the bail context that the government may temporarily and reasonably deprive a defendant of some of his liberties to assure his appearance at trial. Defendant does not address this longstanding historical tradition and instead argues that the Nation's founders did not create laws that restricted gun possession "simply because [a person] was charged with a crime." Mot. Amend Conditions, 9:21, ECF No. 29. That argument is unavoidably negated by a defendant who had been detained pending trial or was unable to meet certain bail conditions, and was thereby denied the right to possess a firearm altogether.

Section 3142(c)(1)(B)(viii) is consistent with the Nation's historical tradition of firearm regulation and providing bail based on reasonable conditions of pretrial release. The Court should uphold the statute under the Second Amendment.

-20-

IV.  **CONCLUSION**

For the reasons above, the Court should deny the motion to modify.


DATED:  August 15, 2022                    Respectfully submitted,

RANDY S. GROSSMAN
United States Attorney

/s Patrick C. Swan
PATRICK C. SWAN
Assistant U.S. Attorney

UNITED STATES' OPPOSITION TO DEFENDANT'S
MOTION TO AMEND CONDITIONS OF PRETRIAL RELEASE