RANDY S. GROSSMAN
United States Attorney
PATRICK C. SWAN
Assistant U.S. Attorney
California Bar No. 306526
Office of the U.S. Attorney
880 Front St., Room 6293
San Diego, CA 92101
Telephone: (619) 546-8450
Email: Patrick.Swan@usdoj.gov

Attorneys for the United States

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 22-cr-1581-GPC-002 |
| | ) | |
| Plaintiff, | ) | **UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR REVIEW OF THE ORDER DENYING MOTION TO AMEND CONDITIONS OF PRETRIAL RELEASE** |
| v. | ) | |
| | ) | |
| JESUS PEREZ GARCIA (2), | ) | |
| | ) | |
| Defendant. | ) | Date:   November 4, 2022 |
| | ) | Time:   10:30 am |
| | ) | |

//
//
//
//
//
//
//
//
//
//

## I.    INTRODUCTION

The Court should affirm the Magistrate Judge's order for three principal reasons. First, Defendant's request to modify conditions is premature and speculative as he has not identified a place of employment to date in which he can work as an armed security for a lawful purpose.  Second, Defendant's facial challenge to Standard Condition #4 fails as Defendant has not shown that no set of circumstances exist under which the statute would be valid.  Third, Defendant's as-applied challenge to Standard Condition #4 fails because Defendant has not demonstrated that (1) he is a "law-abiding" or "responsible" citizen and (2) his proposed conduct – to possess a firearm to secure work as a security guard at a marijuana dispensary – is lawful and falls under the Second Amendment's plain text. Further, even if Defendant meets his initial burden, the United States can show that Standard Condition #4 is consistent with the Nation's historical tradition of firearm regulation.  Accordingly, the Court should deny Defendant's motion for review.

## II.    BACKGROUND

The United States previously filed a thorough opposition to Defendant's motion to modify conditions of release.  ECF No. 32.  The United States incorporates that filing by reference to this opposition and supplements it to respond to new arguments raised by Defendant in his motion to review the Magistrate Judge's Order [ECF No. 44].

### A.    The Offense

On June 24, 2022, at approximately 4:14 am, Defendant entered the United States from Mexico as a passenger of a car.  Upon inspection, the Customs Officer discovered 48 packages of drugs concealed inside the car's rear bumper.  A sample of the packages field tested positive for the characteristics of methamphetamine and fentanyl.  Post-arrest, Defendant waived his *Miranda* rights and admitted that he knew the driver of the car was going to get drugs in Mexico but denied being paid to help cross the drugs.

### B.    Pretrial Services Interview

The day of his initial appearance, Pretrial Services interviewed Defendant to prepare a bail report for the court's review.  During the interview, Defendant said that he

had been unemployed for seven months.  He said that he had previously worked jobs in construction and landscaping.  Defendant's mother verified that he had done construction work from time to time.  Defendant did not say that he was employed as a security guard[1] or previously worked in that field during the interview.

### C.    Bond Package Submission

After the Magistrate Judge set conditions of release, Defendant submitted a bond package to the United States.  On the Bail Information Sheet, Defendant reported that the name of his employer was "security @ Medical shop" and the length of employment was "4 months."  ECF No. 15.  Defendant did not provide further information or documents to support the claimed employment.

### D.    Positive Drug Test and Pretrial Violation

Several weeks after pretrial supervision began, Defendant provided a urine specimen that screened positive for marijuana.  ECF No. 39, 3, ¶ 1.  Defendant was subsequently referred for drug testing.  However, Defendant failed to attend three intake appointments and Pretrial Services was unable to collect samples to determine whether Defendant was continuing to use marijuana.  Defendant also failed to return phone calls to his supervising pretrial officer.  *Id.* at ¶ 2.

During the hearing on the motion to modify conditions, Pretrial Services notified the Magistrate Judge that Defendant applied for a job at a medical marijuana dispensary as a "budtender" while on pretrial release.  ECF No. 38, 9:8-12.  A "budtender" is a staff member at a dispensary who offers suggestions to customers, answers questions, handles products, and showcases product being sold.

Pretrial Services submitted a petition concerning the missed intake appointments and the court ordered Defendant to appear to address the allegations.  ECF No. 38.  On September 19, 2022, Defendant admitted to the allegations and the court allowed him to stay out on bond.  ECF No. 42.

---

[1]  During the post-arrest biographical interview, Defendant said that he was an unemployed security guard.

Two weeks later, Defendant appealed the Magistrate Judge's order denying his motion to remove Standard Condition #4 from his conditions of release. ECF No. 44. This response follows.

## III.   STANDARD OF REVIEW

"If a person is ordered released by a magistrate judge . . . the person may file, with the court having original jurisdiction over the offense, a motion for amendment of the conditions of release." 18 U.S.C. § 3145(a)(2). The district court reviews a magistrate judge's release order de novo. *See United States v. Koenig*, 912 F.2d 1190, 1192-93 (9th Cir. 1990). Unlike a classical application of de novo review, the district court is not required to start over and proceed as if the magistrate judge's decision and findings do not exist. The district court should instead review the evidence before the magistrate judge and make its own independent determination whether the magistrate judge's findings are correct, without deference. *Id.* at 1993.

## IV.   DISCUSSION

### A.   Defendant's Request is Premature and Speculative

In Defendant's motion to modify conditions, Defendant claimed that he "has spent the greater part of this past year working as a security guard at a legal medical marijuana shop" and "is required to carry a firearm" as part of his job. ECF No. 29, 2:6-8. He asked the Magistrate Judge to modify his conditions of release to remove Standard Condition #4 so that he can "have his firearm returned" and "remain gainfully employed in the security industry while on pretrial release." *Id.* at 9:13-15.

Similarly, in the motion for review of the Magistrate Judge's order, Defendant said that "[he] was habitually employed as a security guard in a position that required him to carry a gun as part of his job duties" and "was unable to return to work at his previous place of employment" due to Standard Condition #4. ECF No. 44, 2:13-15, 2:23-24. Defendant appears to be referring to the same security guard position at the medical marijuana dispensary that he identified in his motion to modify.

//

The Magistrate Judge correctly found that Defendant's request to remove Standard Condition #4 so he can possess a firearm in order to earn a better wage as a security guard is premature and speculative. The only evidence before the court was Defendant's request to work as a security guard at a medical marijuana dispensary. There was no information that Defendant has declined to apply for, or turned down offers for, other lawful jobs that require him to possess a firearm. There was no information that Defendant was unable to obtain a job as an unarmed security guard in which he could make a comparable wage.

The defense expressed that Defendant is "very employable" as a security guard at the hearing on the motion to modify. ECF No. 38, 5:9-12. Yet the only job that has been offered to date is at a medical marijuana business. The Magistrate Judge correctly found that Defendant could not work at that job because it would violate a mandatory condition of release and federal law. ECF No. 11, 3:19-20, n.3 (aiding and abetting the distribution of marijuana, a Controlled I Substance, violates 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2).

Should Defendant find a job that (1) requires him to carry a firearm as a condition of employment and (2) does not violate federal law, that may present an adequate change of circumstances to modify his conditions of release and the Court does not need to reach the constitutional challenge. But that has not happened to date. If the Court is inclined to allow Defendant to carry a firearm for employment purposes, the United States renews its request that the firearm be left in the employer's control while Defendant is not at work. *See* ECF No. 32:6-9 (making the same request).

**B.    Defendant's *Bruen* Challenge to Standard Condition #4 Lacks Merit**

**1.    Defendant's facial challenge fails**

To prevail on a facial challenge to a statute, "the challenger must establish that no set of circumstances exists under which the [statute] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). A facial challenge carries a "heavy burden" and it is "the most difficult challenge to mount successfully." *Id.*

The Magistrate Judge correctly found that Standard Condition #4 is a discretionary and temporary condition. A court may only impose it after an individualized assessment

-4-

of the defendant's circumstances and determination that it is needed to reasonably assure defendant's appearance as required and the safety of any other person and the community. 18 U.S.C. § 3142(c)(B)(viii) (the court "may" condition defendant's release subject to the condition that defendant refrain from possessing a firearm). This condition is customarily imposed in this district and other districts because it ensures the safety of Pretrial Services officers who conduct home visits. *See United States v. Snead*, Criminal No. 12-132M, 2014 WL 4473773, at *8 (D.R.I. Feb. 4, 2014); *United States v. Smedley*, 611 F. Supp. 2d 971, 974 (E.D. Mo. 2009). But as a discretionary condition, a court can decide whether to modify the condition as needed. And if charges are dismissed or a defendant is found not guilty at trial, the temporary condition will no longer apply.

Further, as the Magistrate Judge concluded, there are laws that restrict particular categories of people from possessing a firearm based on pending criminal charges, their criminal history, or characteristics such as mental health or substance abuse, that would warrant imposing Standard Condition #4. For example, 18 U.S.C. § 922(d)(1) prohibits sales of firearms to a defendant under indictment; 18 U.S.C. § 922(g)(1) prohibits felons from shipping, transporting, possessing, or receiving a firearm; and 18 U.S.C. 922(g)(3) bars an unlawful user of a controlled substance from shipping, transporting, or possessing a firearm. This reasoning also applies to any other persons whose access to firearms is restricted under provisions of Section 922. As a matter of practice and common sense, there are situations outside Section 922 where the imposition of Standard Condition #4 would be valid. For example, a person who wanted to possess a firearm for an illegal purpose; a person who threatened a witness's safety with deadly force; a person who did not lawfully own the firearm; or a person facing a 30-year mandatory minimum sentence who expressed imminent suicidal ideations.

Additionally, in cases where a defendant is detained without bail, the defendant consequently does not have a right to possess, use, or retain a firearm while in custody. Detention has the same effect as the challenged condition of temporarily depriving an individual of possessing a firearm. But that effect would not render the entire statute

unconstitutional.  *See Salerno*, 481 U.S. at 749, 755 (upholding the primary provisions governing pretrial detention in the Bail Reform Act as constitutional).  To hold otherwise would elevate the liberty interest in possessing a gun over freedom from incarceration.

Because Defendant has not shown that there are no set of circumstances in which the challenged statute would be constitutional, he has not met his "heavy burden." *Salerno*, 481 U.S. at 745.  Therefore, the Court should deny the facial challenge.

### 2.    Defendant's as-applied challenge fails

#### i.    <u>*Bruen's* history and text standard</u>

The Supreme Court recently clarified the "history and text standard" established in *District of Columbia v. Heller*, 5540 U.S. 570 (2008) in reviewing a Second Amendment challenge to a firearm regulation.  *New York Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2138 (2022).  In *Bruen*, the Court concluded that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*. at 2126.  Once this showing is met, the burden shifts to the government to affirmatively show that the firearm regulation is "consistent with this Nation's historical tradition of firearm regulation." *Id.*  If the government fails to meet this burden, then the law is unconstitutional under the Second Amendment. *Id.*

*Bruen's* analysis proceeded in three steps.  First, it asked whether the challenger is part of "the people" whom the Second Amendment protects.  Second, it asked whether the Second Amendment's plain text covers the conduct at issue.  Third, it asked whether the challenged regulation squared with the Nation's history of gun regulation.  142 S. Ct. at 2134-2135, 2138.

At step three, the Court assigned the government the burden of offering historical evidence to support the regulation.  To do so, the Court analogized to "the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms." *Id.* at 2130 (citing *Heller*, 554 U.S. at 582, 595, 606, 618, 634-635).  Though the Court did not explicitly say which party has the burden at steps one and two, it did need to because the parties did not dispute those issues.  The Court explained that

-6-

the challengers – "two ordinary, law-abiding citizens" – were among "the people" whom the Second Amendment protects, and that public carry of handguns for self-protection purposes fell within "the right to keep and bear arms." *Id.* at 2134.

Like the First Amendment's burden-shifting framework, the party challenging a firearm regulation has the burden of proof at step one. Although the government has the burden of justifying an alleged restriction on the freedom of speech, the party challenging the restriction must show that that First Amendment applies in the first place. *See, e.g., Harmon v. City of Norman, Oklahoma*, 981 F.3d 1141, 1147 (10th Cir. 2020) ("Plaintiffs had the initial burden of showing that the First Amendment applies to their conduct."); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 n.5 (1984) ("Although it is common to place the burden upon the Government to justify impingements on First Amendment interests, it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies. To hold otherwise would be to create a rule that all conduct is presumptively expressive."); *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 205 (2d Cir. 2004) ("The party asserting that its conduct is expressive bears the burden of demonstrating that the First Amendment applies.")

ii.    <u>Defendant is not a "law-abiding" or "responsible" citizen</u>

As explained above, Defendant has the initial burden of showing that he is part of "the people" whom the Second Amendment protects. Defendant cannot meet this burden.

In *Heller*, the Supreme Court concluded, by parsing the language in the operative clause of the Second Amendment, that the Amendment does "guarantee the individual right to possess and carry weapons in case of confrontation," a codification, the Court explained, of a "*pre-existing* right." 554 U.S. at 592; *see id.* at 595 ("There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms.").

*Heller* explicitly limited this individual right by reference to other constitutional rights and by reference to the Second Amendment itself. "Like most rights, the right

secured by the Second Amendment is not unlimited." *Id.* at 626; *id.* at 595 ("Of course the right was not unlimited, just as the First Amendment's right of free speech was not."). As the Supreme Court does not "read the First Amendment to protect the right of citizens to speak for *any* purpose," it so does not "read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation." *Id.* at 595.  Specifically, the Court explained that the right embodied in the Second Amendment is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626.  The Court said explicitly: "[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidden the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27.

Cases following *Heller* have maintained this explicit limitation.  *See McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010) (repeating assurances in *Heller* that the right to keep and bear arms is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose, and that nothing in *Heller* should be taken to cast doubt on the longstanding regulatory measures on the possession of firearms by felons and the mentally ill, laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms); *Bruen*, 142 S. Ct. at 2128 ("From Blackstone through 19th-century cases, commentators and courts routinely explained that the [Second Amendment] right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.").

*Heller* further explained that, "whatever else [the Second Amendment] leaves to future evaluations, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635.  This same proposition was endorsed in *Bruen*.  142 S. Ct. at 2131 ("The Second Amendment 'is the very *product* of an interest balancing by the people' and it 'surely elevates above all other

-8-

UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR REVIEW OF THE
ORDER DENYING MOTION TO AMEND CONDITIONS OF PRETRIAL RELEASE

interests the right of law-abiding, responsible citizens to use arms' for self-defense.") (citing *Heller*, 554 U.S. at 635); *id.* at 2132 ("[W]e do think that *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense.").

The Second Circuit read *Heller's* exegesis as "an implicit limitation on the exercise of the Second Amendment right to bear arms for 'lawful purpose[s],' [*Heller*, 554 U.S.] at 628, 630, … and a limitation on ownership to that of 'law-abiding, responsible citizens,' *id.* at 635 …." *United States v. Bryant*, 711 F.3d 364 (2d. Cir. 2013). A court adopted this reasoning following *Bruen* as well. *United States v. Ingram*, Criminal Action No.: 0:18-557-MGL-3, 2022 WL 3691350, at *3 (D.S.C. Aug. 25, 2022) (concluding that the distinction between law-abiding and non-law-abiding citizens in *Heller*, *McDonald*, and *Bruen* "clarifies the bounds of the plain text of the Second Amendment," and because the statutes at issue "prohibit the use of firearms by non-law-abiding citizens for unlawful purposes," the conduct they prohibit is not protected by the Second Amendment).

Further, in *United States v. Nutter*, Criminal Action No. 2:21-cr-00142, 2022 WL 3718518, (S.D.W.V. Aug. 29, 2022), a post-*Bruen* case, the court rejected a challenge to laws barring a person previously convicted of misdemeanor crimes of domestic violence to possess guns. In its analysis, the court noted the importance of the Supreme Court's repeated invocation of "law-abiding citizens" in its recent Second Amendment decisions, and found support in the historical tradition for laws prohibiting particular categories of persons from possessing firearms in the interest of public safety. *Id.* at *7-8.

For purposes of pretrial release, Defendant is not a "law-abiding" or "responsible" citizen. He has been charged with a felony based on a finding of probable cause. In lieu of detention pending trial, he has been released subject to conditions that place reasonable limitations on his liberty to ensure his appearance as required and the safety of any other person and the community. For example, Defendant cannot enter Mexico, he must submit to drug testing, and he must not use or possess marijuana. *See* ECF No. 10. Persons with pending criminal charges are routinely subject to significant restrictions on their liberty

once probable cause has been shown.  *See, e.g., Maryland v. King*, 569 U.S. 435, 461 (2013) (privacy expectations of a person in custody are diminished); *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975) (a probable cause determination by a neutral magistrate judge is required "as a prerequisite to extended restraint of liberty following arrest"); *United States v. Thomas*, 540 F. Supp. 3d 363, 370 (W.D.N.Y. 2021) ("[T]he reality is that once an individual has been charged with a crime, certain rights must give way to reasonable restrictions in order to protect the safety of others and the community, prevent any risk of flight, and ensure compliance with pretrial release conditions.").  The restriction on Defendant's ability to possess a firearm while charges are pending against him is a temporary restriction that will be removed if charges are dismissed or if he is found not guilty at trial.  Restrictions on a defendant's liberty while charges are pending, even those as significant as detention, are necessary regulatory measures that do not violate the Constitution or the presumption of innocence.  *Salerno*, 481 U.S. at 748 ("We have repeatedly held that the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest); *Thomas*, 540 F. Supp. 3d at 371 (explaining that 18 U.S.C. § 3142(c)(1)(B) expressly provides that a pretrial release condition may require a person to refrain from possessing a gun notwithstanding that person's Second Amendment rights); 18 U.S.C. § 3142(j) (stating that nothing in the Bail Reform Act shall be construed as modifying or limiting the presumption of innocence).

Further, Defendant is not a "law-abiding" or "responsible" citizen because he has worked at a medical marijuana dispensary aiding the distribution of marijuana in violation of federal law.  He has also screened positive for marijuana while on pretrial release and has failed to abide by other conditions of release.  It also appears that he applied for a job as a "budtender" and is continuing to ask the court to work as an armed security guard at a medical marijuana dispensary.  Defendant cannot be a "law-abiding" or "responsible" citizen under the Second Amendment's plain text if he continues to conduct himself in a manner that violates federal law.

-10-

1    Defendant contends that the Ninth Circuit's decision in *United States v. Chovan*,

2 735 F.3d 1127 (9th Cir. 2013) forecloses the Magistrate Judge's ruling on this issue

3 because it held that domestic violence misdemeanants receive Second Amendment

4 protection.  Defendant is mistaken.  First, *Chovan* did not address or analyze whether

5 *Heller* and its progeny mandate an implicit limitation on Second Amendment protections

6 to that of law-abiding, responsible citizens.  *Chovan* also applied a different test than the

7 one articulated in *Bruen*.  *Id.* at 1136 (asking whether the challenged law burdens conduct

8 protected by the Second Amendment); *cf. Bruen*, 142 S. Ct. at 2126 (asking whether the

9 Second Amendment's "plain text" covers one's conduct).  *Chovan's* conclusion that there

10 was insufficient evidence in the historical record that "*domestic violence misdemeanants*

11 in particular have historically been restricted from bearing arms," 735 F.3d at 1137, also

12 does not reflect upon individuals facing felony charges while on pretrial release.

13    Second, *Chovan* explicitly said that the challenged law "[did] not implicate th[e]

14 core Second Amendment right" of "law-abiding, responsible citizens to use arms in

15 defense of hearth and home."  *Id.* at 1138.  The Ninth Circuit went further: "Although

16 [Chovan] asserts his right to possess a firearm in his home for the purpose of self-defense,

17 we believe his claim is not within the core right identified in *Heller* – the right of a *law-*

18 *abiding, responsible* citizen to possess and carry a weapon for self-defense – by virtue of

19 [Chovan]'s criminal history as a domestic violence misdemeanant."  *Id.* (citation omitted).

20 *Chovan* thus endorsed the concept articulated in *Heller* that a person could be deemed not

21 "law-abiding" or "responsible" to receive Second Amendment protection.

22    Third, unlike the temporary firearm restriction in Standard Condition #4, *Chovan*

23 held that the law at issue operated as a "total prohibition" and "lifetime ban" on firearm

24 possession for a class of individuals.  *Id.*  The law at issue was a "serious encroachment"

25 on Second Amendment rights, notwithstanding that it did not implicate the "core right"

26 identified in *Heller* of "law-abiding, responsible citizens."  *Id.*

27    Defendant also argues that neither *Heller* nor *Bruen* explicitly says that only law-

28 abiding, responsible citizens receive Second Amendment protection.  The United States is

-11-

1   not advancing that argument.  The United States is instead arguing that *Heller's* language

2   and interpretation of the Second Amendment acts an implicit limitation on the exercise of

3   the right to bear arms for "lawful purposes," *Heller*, 544 U.S. at 628, 630, and to those of

4   "law-abiding, responsible citizens," *id.* at 635.  The Supreme Court in *McDonald* notably

5   confirmed this limitation when it said that the "central holding in *Heller*" was "that the

6   Second Amendment protects a person's right to keep and bear arms for *lawful purposes*,

7   most notably for self-defense within the home."  561 U.S. at 780 (emphasis added);

8   *accord United States v. Potter*, 630 F.3d 1260, 1261 (9th Cir. 2011) (per curiam)

9   (explaining that "[b]oth implicitly and explicitly, [*Heller*] made clear that its holding

10  concerned the *lawful* possession and use of a firearm").

11      Because the Second Amendment right is implicitly limited to "law-abiding,

12  responsible citizens," and Defendant has not affirmatively demonstrated that he falls

13  within that group of people, he does not receive Second Amendment protection here.

14          iii.    <u>Defendant's proposed conduct – to work as an armed security
                    guard at a medical marijuana dispensary – is not protected by</u>
15                  <u>the "plain text" of the Second Amendment</u>

16      Further, Defendant cannot meet his initial burden to show that his proposed conduct

17  falls within the Second Amendment's "plain text."  *Bruen*, 142 S. Ct. at 2126.

18      The Second Amendment's plain text provides:

19          A well regulated Militia, being necessary to the security of a
            free State, the right of the people to keep and bear Arms, shall
20          not be infringed.

21                                                      U.S. Const. amend. II.

22      Defendant claims that he is "required to carry a firearm" as a condition of his

23  employment as "a security guard at a legal medical marijuana shop.  ECF No. 29:6-8.

24  Defendant asks "to have his firearm returned so that he can remain gainfully employed in

25  the security industry while on pretrial release."  *Id.* at 9:13-15.  Defendant made the same

26  request in this appeal.  ECF No. 44, 3:23-25.  In the court's order, the Magistrate Judge

27  found that "[t]he only position that has been offered to [Defendant] is at a marijuana

28  dispensary" and "there is no information before the [c]ourt to suggest that [he] has

-12-

declined to apply for, or turned down offers for, other lawful jobs that require him to carry a firearm." ECF No. 41, 13:5-9.

Based on this information, Defendant's proposed conduct is to possess a firearm in order to work as a security guard at a medical marijuana business. This proposed conduct does not fall within the Second Amendment's plain text.

First, Defendant's proposed conduct is unlawful. As a security guard, he would be aiding and abetting the distribution of marijuana, a Controlled I Substance, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. And if he is armed, he might arguably be using or carrying a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). The Supreme Court explicitly said its central holding in *Heller* is that the "Second Amendment protects a personal right to keep and bear arms for *lawful* purposes, most notably for self-defense within the home." *McDonald*, 561 U.S. at 780 (emphasis added). The Ninth Circuit also concluded that "it cannot seriously be contended" that the Second Amendment guarantees a right to use a firearm for an unlawful purpose, such as in furtherance of drug trafficking. *Potter*, 630 F.3d at 1261. As Defendant's proposed conduct is for an unlawful purpose, it falls outside the Second Amendment's plain text.

Second, Defendant's proposed conduct is not for a self-defense purpose.[2] It is instead for an employment purpose. Nothing in the Second Amendment's plain text secures a person's right to possess a firearm to secure a certain type of employment, except arguably to join the "well regulated Militia." U.S. Const. amend. II. Neither *Heller* nor *Bruen* interpreted the Second Amendment to confer such a right either.

Even if Defendant planned to use his firearm for the purpose of protection at the medical marijuana business, *Heller* and *Bruen* explained that the Second Amendment is

---

[2] The Second Amendment confers an individual right to keep and bear arms specifically for the purpose of self-defense. *Heller*, 544 U.S. at 628 ("[T]he inherent right of self-defense has been central to the Second Amendment right."); *id.* at 630 (describing self-defense as the "core" purpose of the Second Amendment); *McDonald*, 561 U.S. at 765 ("[I]n *Heller*, we held that individual self-defense is 'the *central component [ ]*' of the Second Amendment right."); *Bruen*, 142 S. Ct. at 2118 ("[I]ndividual self-defense is 'the central component' of the Second Amendment right").

-13-

not a right to keep and carry a firearm for *any* type of confrontation.  *See Heller*, 544 U.S. at 595 ("The right [to bear arms] was not unlimited, just as the First Amendment's right of free speech was not … [W]e do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose*.") (emphasis in original); *Bruen*, 142 S. Ct. at 2128 ("From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right [to bear arms] was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.").  By virtue of his employment as a security guard, Defendant would be tasked with protecting the business and safety of *other* people and things at the business, such as the employees, customers, and business property.  It would not specifically or primarily be for a self-defense purpose.

Defendant argues in passing that Standard Condition #4 has deprived him of other benefits of owning a firearm, including the right to defend himself and his family at home. This is a natural and collateral consequence for a restriction on the possession of a firearm. Even if Defendant kept his firearm at home to protect himself and his family, it would still be a crime for him to use or carry the firearm as a security guard at a medical marijuana dispensary.  The only evidence before the Magistrate Judge, as well as this Court, is that Defendant wants his firearm returned so that he could get his old job back.  This type of conduct is not protected by the Second Amendment's plain text, regardless of any other desire to protect himself or others at home.  Defendant has not met his initial burden to show that his proposed conduct is protected by the Second Amendment's plain text.

iv.   Standard Condition #4 is consistent with the Nation's historical tradition of regulating firearms

Even if Defendant meets his initial burden to demonstrate that his proposed course of conduct falls within the Second Amendment's plain text, the United States can show that Standard Condition #4 squares with the Nation's historical tradition of restricting access to firearms for persons charged with a crime.  The United States incorporates by

-14-

reference the detailed discussion of this historical tradition in its opposition to Defendant's motion to modify conditions of release.  ECF No. 32, 13:16-20.  The United States writes separately to address three additional points.

First, *Bruen* instructs that the "historical inquiry that courts must conduct will often involve reasoning by analogy" and "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are relevantly similar."  142 S. Ct. at 2132 (internal citation omitted).  The Court identified "two metrics" that would render regulations relevantly similar under the Second Amendment: "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Id.* at 2132-33.  This is the framework that the Court should follow in its analysis.

Defendant argues that the Court cannot apply this framework because the need to regulate people charged with crimes is a general societal problem that has persisted since the 18th century.  This claim lacks merit.  What has not persisted since the 18th century, and what was unimaginable at the time of the Nation's founding, is how firearms have evolved, how accessible firearms are today, the growth of the population of the United States, the prevalence of organized crime, the creation of Pretrial Services to help courts throughout the United States supervise and monitor defendants on pretrial release, and the need to protect Pretrial Services officers who conduct home visits during the course of supervision.  As *Bruen* explained, "[t]he regulatory challenges posed by firearms today are not always the same that preoccupied the Founders…."  142 S. Ct. at 2132.  "[T]he Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated."  *Id.*  Further, *Bruen* did not limit a court's ability to reason by analogy in conducting an analysis of whether a modern firearm regulation is consistent with the Second Amendment's historical understanding.  *Bruen* simply stated that straightforward historical inquiries and analogies may be used when confronting laws that have addressed a general societal problem since the 18th century,  *id.* at 2131, and other cases implicating new societal concerns or technological changes may require a more nuanced analysis of

-15-

whether a historical regulation is an appropriate analogue for a distinctly modern firearm regulation, *id.* at 2132.

Second, a historical analogue to Standard Condition #4 exists in the form of surety statutes discussed in *Bruen*.  These laws can be traced to the mid-19th century.  142 S. Ct. at 2148 ("In the mid-19th century, many jurisdictions began adopting surety statutes."). While these laws were not "bans on public carry," they did restrict it.  *Id.* at 2149.  For example, in 1836, the State of Massachusetts enacted a law which "required any person who was reasonably likely to breach the peace . . . to post a bond before publicly carrying a firearm."  *Id.* at 2148 (internal citation omitted).  From 1838 to 1871, "nine other jurisdictions adopted variants of the Massachusetts law."  *Id.*

*Bruen* declined to conclude that the surety laws represented a well-established historical analogue to the New York law at issue.  *Id.* at 2148-50.  The Court explained that "the surety statutes presumed that individuals had a right to public carry that could be burdened only if another could make out a specific showing of reasonable cause to fear an injury, or breach of the peace," and "New York presumes that individuals have *no* public carry right without a showing of heightened need."  *Id.* at 2148 (internal quotation omitted).  The Court explained that the surety laws restricted a person's carrying of arms "only when 'attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them.'"  *Id.* (quoting William Rawle, A View of the Constitution of the United States of America 126 (2d ed. 1829).

Unlike the New York law that was struck down in *Bruen*, Standard Condition #4 does not restrict the Second Amendment rights of every citizen.  Like the surety statutes, Standard Condition #4 operates to restrict the rights of a discrete group of people, not the public generally, allows restrictions for purposes of public safety, and remains faithful to the idea that individuals have a right to bear arms.  The surety statutes generally provided that a person's Second Amendment right "could be burdened only if another could make out a specific showing of reasonable cause to fear an injury, or breach of the peace." *Bruen*, 142 S. Ct. at 2148 (internal citation omitted).  Similarly, Standard Condition #4

-16-

UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR REVIEW OF THE
ORDER DENYING MOTION TO AMEND CONDITIONS OF PRETRIAL RELEASE

only burdens an individual's Second Amendment rights during pendency of pretrial release. *See United States v. Kays*, Case No. CR-22-40-D, 2022 WL 3718519, at *4 (W.D. Okla. Aug. 29, 2022) (in rejecting *Bruen* challenge to the law prohibiting receipt of a firearm during the pendency of indictment, the court explained that Section 922(n) "only burdens an individual's Second Amendment rights during the pendency of indictment, a volatile period during which the stakes and stresses of pending criminal charges often motivate defendants to do violence to themselves or others") (internal quotation marks and citation omitted).

Further, the restriction imposed by Standard Condition #4 is narrow and has numerous procedural safeguards. Standard Condition #4 does not prevent a person from publicly carrying a firearm. It simply limits a person's ability to possess a firearm while on pretrial release. This is a temporary condition that will lifted if charges are resolved in the person's favor. Moreover, as explained by the Supreme Court, 18 U.S.C. 3142 has "extensive procedural safeguards" including, but not limited to, an adversarial hearing, presence of counsel at the hearing, the ability to testify, present witnesses, and proffer evidence on a person's behalf, and cross-examine witnesses appearing at the hearing. *Salerno*, 481 U.S. at 742. A neutral judicial officer can then impose certain conditions which will reasonably assure the person's appearance as required and the safety of any other person and the community, including a temporary firearm restriction. 18 U.S.C. § 3142(c)(B)(viii). And as the Magistrate Judge noted in her order, these conditions are discretionary and the court can remove or modify them upon adequate justification.

*Bruen* instructs that "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133. "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

The surety laws discussed in *Bruen* are an appropriate historical analogue for Standard Condition #4, and Standard Condition #4 squares with the Nation's historical tradition of firearm regulation.

-17-

Defendant cites *United States v. Quiroz*, --- F. Supp. 3d ----, PE:22-CR-00104-DC, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022) for the proposition that the surety laws in *Bruen* do not serve as a relevantly similar historical analogue to Standard Condition #4. In *Quiroz*, the court analyzed Massachusetts' surety laws to the statute prohibiting receipt of firearms for a person under felony indictment (§ 922(n)). *Id.* at \*7-8. The court stated that much like Section 922(n), the Massachusetts' surety laws addressed the societal fear that those accused – like those under indictment – would "make an unlawful use of their firearm," yet surety laws addressed that fear through means "materially different" than Section 922(n). *Id.* at \*8. Specifically, rather than completely restrict the accused's constitutional right to possess a gun, surety laws permitted the accused to prove a special defense need; and if they could not show that need, the accused could post a money bond for no more than six months to keep his firearms. In contrast, Section 922(n) did not offer an adversarial hearing, it wholly restricted a person's right to receive a firearm indefinitely after indictment by a grand jury, and the accused could not overcome this restriction by posing a money bond. Based on these differences, the court determined that the laws addressed a general societal problem through materially different means and thus the surety laws did not serve as a historically relevant analogue to Section 922(n). *Id.*

*Quiroz* is not instructive here as Standard Condition #4 is only imposed after an adversarial proceeding with "extensive procedural safeguards." *Salerno*, 481 U.S. at 742. Standard Condition #4 is also a discretionary condition and the accused could overcome this restriction by providing an adequate justification for the firearm. *Quiroz's* findings regarding Section 922(n) to surety statutes is not applicable here.

Lastly, third, the Nation's historical tradition embraces a court's ability to detain a defendant pending trial or to release him subject to reasonable limitations on his liberty. Detention without bail necessarily serves as a historical analogue to restricting firearm possession of those facing felony charges.

Trial courts have long had the authority to impose conditions on defendants' ability to remain at liberty pending trial, or even to detain them. The institution of bail, which is

-18-

expressly recognized by the Eighth Amendment, has existed for centuries.  *See, e.g., June Carbone, Seeing through the Emperor's New Clothes: Rediscovery of Basic Principles in the Administration of Bail*, 34 Syracuse L. Rev. 517-529 & n.1 (1983) (explaining that the institution of bail existed in English law since shortly after the Norman conquest, defining "bail" broadly to refer to any condition of pretrial release).

There is no constitutional right to bail.  *See United States v. Portes*, 786 F.2d 758, 766-68 (7th Cir. 1985) (holding that neither the Fifth nor Eighth Amendment guarantees a right to bail); *United Stated v. Edwards*, 430 A.2d 1321 (D.C. 1981) (en banc), *cert. denied*, 455 U.S. 1022 (1982) (same); *United States v. Kouyoumdjian*, 601 F. Supp. 1506, 1511 (C.D. Cal. 1985) (same); *see also Carlson v. Landon*, 342 U.S. 524, 525 (1952) (holding that Congress can enact laws denying pretrial release in capital cases).  Instead, federal courts have the power to deny a person pretrial release under certain situations. *See* 18 U.S.C. § 3142(e); *United States v. Salerno*, 481 U.S. 739, 749 (1987) (recognizing that an arrestee may be incarcerated pending trial if he presents a risk of flight or danger to witnesses); *id.* at 755 (holding that the provision of the 1984 Bail Reform Act allowing pretrial detention due to potential dangerousness is constitutional).  A defendant may even be detained where he cannot pay the bail required.  *United States v. McConnell*, 842 F.2d 105, 107-08 (5th Cir. 1988).

Congress has sought to reduce pretrial detention resulting solely from an indigent defendant's inability to pay by instructing courts to prioritize nonfinancial conditions of release, including restrictions on travel and association, curfews, and "any other condition deemed reasonably necessary."  Bail Reform Act of 1966, 18 U.S.C. § 3146, Pub. L. 89-465, June 22, 1966, 80 Stat. 214.  Those "other conditions" included restrictions on firearms possession while on bond.  *See, e.g.*, SEN. REP. NO. 98-225, at 13 (1983) ("Although each of the additional conditions could appropriately be imposed today under the catch-all in current law, spelling them out in detail is intended to encourage the courts to utilize them in appropriate circumstances.").  All of the nonfinancial conditions of release are less restrictive than pretrial detention.

1    Under Section 3142, a federal court can order a defendant detained pending trial,

2  *Salerno*, 481 U.S. at 741, where he would necessarily be precluded from possessing any

3  type of firearm while in custody.  This is consistent with Nation's historical tradition of

4  firearms regulation, as there is no constitutional right to bail.  Again, based on historical

5  tradition, if the government has the greater power to put a defendant in custody pending

6  trial and deny him the right to possess a firearm altogether, it must also have the lesser

7  power to release him subject to reasonable conditions.

8    Further, throughout history, the government has had the power to restrict other

9  liberties and constitutional rights in the pretrial context.  For example, by subjecting a

10  defendant to searches that would otherwise be unreasonable, *see Maryland v. King*, 569

11  U.S. 435 (2013) (DNA collection); *Florence v. Board of Chosen Freeholders*, 566 U.S.

12  318 (2012) (strip searches), by imposing curfews or electronic monitoring, *see United

13  States v. Stephens*, 594 F.3d 1033, 1039 (8th Cir. 2010), or by freezing assets that one

14  wants to use to pay his chosen lawyer, *see Kaley v. United States*, 571 U.S. 320 (2014).

15  If a historical tradition of restricting other pretrial rights exists, the power to release a

16  defendant subject to a temporary firearm restriction has similar authority.

17    The historical tradition of the Eighth Amendment, as well as the historical traditions

18  in both common and statutory law, contemplate in the bail context that the government

19  may temporarily and reasonably deprive a defendant of some of his liberties to assure his

20  appearance at trial and safety of any other person and the community.  Section 3142(c)(1)

21  (B)(viii) is consistent with the Nation's historical tradition of firearm regulation and

22  providing bail based on reasonable conditions of pretrial release.  The Court should

23  uphold the statute under the Second Amendment.

24  //

25  //

26  //

27  //

28  //

1

## V.   **CONCLUSION**

2       For the reasons above, the Court should deny Defendant's motion for review of the

3  order denying the motion to amend conditions of pretrial release.

4

5  DATED:  October 17, 2022                          Respectfully submitted,

6                                                     RANDY S. GROSSMAN
                                                      United States Attorney
7

8                                                     /s Patrick C. Swan
                                                      PATRICK C. SWAN
9                                                     Assistant U.S. Attorney

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR REVIEW OF THE
ORDER DENYING MOTION TO AMEND CONDITIONS OF PRETRIAL RELEASE